UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CHRISTIAN R. EVERT,

                      Plaintiff,

v.                                    **DECISION AND ORDER**
                                                              14-CV-912S
WYOMING COUNTY COMMUNITY HEALTH
SYSTEM, et al.,

                      Defendants.

## I.    INTRODUCTION

Plaintiff, Christian R. Evert, brings this action against Defendants Wyoming County Community Health System and Wyoming County Community Hospital (together, "WCCH"), asserting claims for gender discrimination, hostile work environment, retaliation, and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). WCCH has moved for summary judgment, seeking dismissal of Evert's claims under Federal Rule of Civil Procedure 56. For the reasons discussed below, WCCH's motion is granted.

## II.    BACKGROUND[1]

In April 2010, Evert was hired by WCCH as a Registered Professional Nurse and assigned to the Intensive Care Unit ("ICU"). At the time that Evert left WCCH, Denise Prusak, the ICU Nurse Manager, served as Evert's supervisor and Dawn James, the Director of Nursing, oversaw all nursing staff, including Prusak and Evert.[2] As part of

---

[1] The facts are derived principally from the parties' Local Rule 56 Statements, the parties' declarations, and exhibits attached thereto. Only the facts necessary to the resolution of the motion are recounted below. The facts are undisputed unless otherwise stated.
[2] Evert notes that her supervisors differed at the time that she was hired. She also contends that her

1

her nursing duties, Evert also provided care for inmate-patients from Attica Correctional Facility ("Attica") being treated at WCCH. The inmate-patients were held in a "lockup unit" located on the same floor as the ICU, which was separated by a steel door with restricted access. The lockup unit was operated by New York State Department of Corrections and Community Supervision ("DOCCS"), and corrections officers employed by DOCCS transported the inmate-patients from Attica to WCCH and guarded them during their hospital stay.

The Inmate-Patient Incident

The thrust of Evert's complaint relates to an incident involving an inmate-patient and the aftermath of that incident. On August 23, 2012, Evert provided care to an inmate in the lockup unit who was recovering from surgery and experiencing new bleeding at his incision site. Evert alleges that a corrections officer working in the lockup unit physically assaulted the inmate and caused the bleeding, although she did not personally witness the alleged assault. Evert notified Heather Green, WCCH's corrections liaison, that an inmate had complained of mistreatment. Green met with the inmate, who refused to discuss the incident.

Several days later, the inmate sent Evert an eight-page, hand-written letter stating that he had been uncomfortable when Green asked him to report the incident because a corrections officer was in the room. He also thanked Evert for her care, referred to Evert's nursing work outside the ICU, and invited Evert to continue corresponding with him or to visit him in prison. Evert alleges that she immediately gave the letter to Susan Papke, whom Evert considered to be her direct supervisor on

---

direct supervisor varied depending on the shift. There is no dispute that both James and Prusak had supervisory authority over Evert.

that shift. Evert further alleges that Papke read the letter aloud while making "specific sexual comments," though Evert gives no examples of what was said and the letter itself is not sexual in nature. Evert also alleges that Papke told other nurses at WCCH that Evert was receiving "love letters" and had a "boyfriend."

Nurses providing care to inmates inside the lockup unit are required to adhere to specific rules and practices for safety put into place by WCCH and DOCCS. The rules warn against developing a friendly relationship with inmate-patients, and specifically direct nurses not to discuss their personal business with or near inmates and to limit their dialogue to matters that are medically necessary. The rules also warn against receiving "love letters" and require that any correspondence from an inmate-patient be reported and the letter returned to the correctional facility.

Evert alleges that the "love letters" language was added to WCCH's written guidelines after she received the inmate's letter and was a form of sexual harassment directed at her. Evert further alleges that she kept her communications with the inmate strictly professional, and that any personal details came from a conversation she had with corrections officers and that the inmate overheard.

<u>Harassment by Corrections Officers</u>

Evert alleges that the corrections officers began harassing her after she received the inmate letter. She refused to provide a copy of the letter when a corrections officer demanded it because, she alleges, she feared there was a conflict of interest as the letter discussed the alleged assault. The officer was ultimately given a copy over Evert's protests. Evert alleges that the corrections officers pressured her to report the letter and make a complaint regarding the inmate, but that she refused because she

3

was waiting for guidance from Green as to the appropriate response.

Evert further alleges that the corrections officers became hostile after this, calling her "bitch," "cunt," and "narc" on nearly a daily basis and refusing to allow her into the lockup unit. She attributes their hostility to her refusal to give them a copy of the inmate's letter, and to her questions as to how the inmate left Attica with the letter, since it would be considered contraband. She states that the officers "did everything in their control to hide their inconsistencies or mistakes. They feared me taking their lack of security of inmates to a higher discipline." (Docket No. 23-1 ¶ 78.) Evert states that she believes the officers felt entitled to make such comments because she was a woman.

WCCH contends that the corrections officers denied Evert access to the lockup unit because they believed she was not complying with the rules. It is undisputed that Evert was not disciplined in connection with the letter or her actions in the lockup unit. Evert alleges that she complained to Prusak and Green that the corrections officers were harassing her and refusing to give her access to the lockup unit.

Despite her allegations that the officers called her names daily, Evert also alleges that things were "peaceful" with the corrections officers in the two months after she received the letter, but flared up when she entered the lockup unit on November 8, 2012 and an officer called her a "bitch." Evert alleges that she felt unsafe working in the lockup after this.[3] Evert again complained to Green; Green advised Evert that she would be required to take a class regarding lockup unit rules before she was allowed to return. Evert also alleges that Green instructed her not to report her complaints to Attica.

---

[3] It is undisputed that Evert's work in the ICU did not require her to enter the lockup unit, and that she was able to avoid it if she chose to do so.

Harassment by Supervisors

In addition to the "love letters" language and the teasing from Papke about having a boyfriend, Evert also alleges that she was harassed by Prusak and other WCCH staff during her time at WCCH.

WCCH alleges that Evert received numerous "coaching" documents related to her work, which were not disciplinary, but given to address performance failings. Evert also received three disciplinary actions, a verbal warning, a written warning, and a suspension between June 2011 and November 2012. In November 2012, Plaintiff was suspended for five days for violating WCCH's patient transfer protocol and transferring a patient who was in "filthy" condition. A union representative advised Evert against disputing the allegations that were the basis for the suspension and also said that Evert should be terminated for her actions in connection with that incident. Evert disputes the facts underlying these disciplinary actions, but did not file a grievance with her union representative, per the terms of her collective bargaining agreement, challenging them. In particular, Evert asserts that the suspension was an attempt to harass her after the inmate incident. She stated in her deposition and her opposition to this motion that she does not believe she was suspended because of her gender.

Prusak, who did not hire Evert, also allegedly told Evert that she did not want her in the ICU. Evert alleges additional verbal harassment from Prusak, that she made unspecified "gender specific remarks" to and about Evert and told her "I am watching you," which Evert took to be a threat. Evert further alleges that Prusak's husband was a corrections officer at Attica, and that Prusak therefore had a "conflict of interest."

5

Transfer out of ICU

In December 2012, Prusak and James held a meeting with Evert in which they informed her that she would be transferred out of the ICU to work in the Medical/Surgical Unit. WCCH contends that this decision was made because Evert was believed to have started a rumor about another ICU nurse that caused tension in the department and because of Evert's prior disciplinary record. WCCH also contends that the meeting was not disciplinary in nature, and it is undisputed that the position offered to Evert did not result in a loss of wages or benefits. However, Evert alleges that she was overqualified to work in the Medical/Surgical Unit and that the move was a punishment. She further alleges that the new position would have conflicted with her commitments outside work and that the Medical/Surgical Unit was located closer to Prusak's office, which made her feel unsafe. Evert contends that Prusak and James mocked, belittled, and bullied her during this discussion, and that:

> No tension or rumor ever occurred. This was a self-made lie Denise Prusak and Dawn James made-up to get me to resign my position due to knowledge of Attica correction Officer allegedly physically harming an inmate patient. Witnessing the Officer threaten the inmate. Heather Green voiced concern over losing the Attica contract resulting in great financial loss. [sic]

(Docket No. 23-1 ¶ 45.)

Evert left the December 13, 2012 meeting before it concluded, visibly upset, and did not return to work again. James and Prusak contacted Evert to encourage her to return, but Evert instead used her accrued paid leave through January 2013. Evert alleges that she contacted her union representative to request that a grievance be filed after the meeting, but the union representative failed to file the grievance despite Evert's multiple requests. When her paid leave was exhausted, Evert submitted a letter of

6

resignation in order to comply with the WCCH two week notice policy and leave in good standing.

Evert alleges that she suffered a nervous breakdown due to the harassment at WCCH. She filed a claim of discrimination with the Equal Employment Opportunity Commission ("EEOC") and, upon receiving a dismissal and notice of right to sue, Evert brought this action.

### III. LEGAL STANDARDS

"A motion for summary judgment may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010). A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor, 609 F.3d at 545 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2003) *cert. denied*, 540 U.S. 811, 124 S. Ct. 53, 157 L. Ed. 2d 24 (2003) (quoting Anderson, 477 U.S. at 248).

### IV. DISCUSSION

In her Complaint, Evert claims that WCCH discriminated against her based on her gender, in violation of Title VII. However, as Evert herself stated at her deposition and by affidavit, the alleged bullying and harassment arose because of her actions, not because of her gender. As recently stated by the Southern District:

7

> Bullying and harassment have no place in the workplace, but unless they are motivated by the victim's membership in a protected class, they do not provide the basis for an action under [Title VII] . . . The Court does not condone bullying, but it cannot read Title VII to protect its victims unless the bullying reflects discrimination based on race, color, religion, sex, or national origin.

Johnson v. City Univ. of N.Y., 48 F. Supp. 3d 572, 574 (S.D.N.Y. 2014). Evert alleges that she was harassed by the Corrections Officers in the lockup unit and by her female supervisors at WCCH. However, in both instances, she alleges harassment related to the incident with the inmate-patient or personality conflicts. Title VII does not provide relief for such claims.

**A.      Gender Discrimination and Hostile Work Environment**

To set forth a *prima facie* case of gender discrimination under Title VII, Evert must point to evidence in the record showing that: (1) she is a member of a protected class; (2) she was qualified for and competent at her position; (3) she was subjected to an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination based on her membership in the protected class. See Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005). "[M]istreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Title VII does not prohibit employers from maintaining nasty, unpleasant workplaces, or even ones that are unpleasant for reasons that are sexual in nature. Rather, it prohibits employers from discriminating against an employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); see also Krasner v. HSH

Nordbank AG, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010) ("The prohibited causal factor requirement thus flows directly from the text of Title VII, and from the very essence of its nature as an anti-discrimination law.").

There is scant evidence here that any of the incidents Evert describes were related to her gender. Indeed, Evert relies primarily on comments and actions by her female nursing colleagues as evidence of discrimination. "[W]here the plaintiff and the individual whose conduct is at issue are members of the same protected class, the inference that the conduct constitutes harassment or discrimination is weakened." Waters v. Gen. Bd. of Global Ministries, 769 F. Supp. 2d 545, 554 (S.D.N.Y. 2011). That inference is further weakened here by Evert's own contentions that Prusak's comments were motivated by personality conflict or by some loyalty to the corrections officers, as well as the fact that many of the comments were unrelated to her gender. See Davis-Bell v. Columbia Univ., 851 F. Supp. 2d 650, 678 (S.D.N.Y. 2012) ("Mere personality conflicts must not be mistaken for unlawful discrimination."), Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002) ("Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex," which "requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."). Further, Evert herself states that she believes her suspension was prompted by the inmate incident, and not by her gender, and attributes some of the harassment to her colleagues' fears of losing the income from Attica associated with having the lockup unit inside WCCH. Thus, it appears that WCCH's actions, including the decision to transfer

Evert in order to avoid further conflict with the corrections officers, appear to have been taken in correlation with business decisions. See, e.g., Fitzpatrick v. N.Y. Cornell Hosp., No. 00 Civ. 8594(LAP), 2003 WL 102853, at *6 (S.D.N.Y. Jan. 9, 2003) ("The laws prohibiting discrimination in employment were not intended to transform the courts into personnel managers. . . . [District courts] must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process.") (internal citations and quotations omitted).).

As to the derogatory terms used by the male corrections officers,[4] only some of which are gender-specific, Evert herself explains that they were angry with her for accusing an officer of assaulting an inmate and for questioning them as to how the inmate smuggled out a letter. Examining the totality of Evert's alleged encounters with the corrections officers, "most of which comprise unrebutted facially neutral behavior that plaintiff has failed to clothe in discriminatory dress," Evert's claim "fails to meet the necessary standard" for actionable gender hostility, despite her subjective belief that they felt entitled to harass her due to her gender. See Wood v. Sophie Davis School, No. 02 CIV.7781 HB, 2003 WL 22966288, at *8 (S.D.N.Y. Dec. 15, 2003). "A plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." Whethers v. Nassau Health Care Corp., 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013)

---

[4] It is not clear whether WCCH would be liable for the corrections officers' actions under Title VII because they were not WCCH employees. Although the Second Circuit has not yet addressed the question of whether an employer may be held liable on a hostile work environment theory for the actions of a non-employee, see General v. Ctr. for Disability Rights, 481 F. App'x 678, 680 (2d Cir. 2012), some courts have found that such actions may be imputed to the employer if it failed to take steps "reasonably calculated to end the harassment." McDonald v. B.E. Windows Corp., No. 01 Civ. 6707, 2003 WL 21012045, at *4 (S.D.N.Y. May 5, 2003) (citing cases). This Court need not address the issue because, as further discussed below, Evert has not provided evidence that the corrections officers' animus toward her was based on her gender.

10

(internal quotation omitted). Instead, "the belief must be reasonable and characterized by *objective* good faith." Johnson, 48 F. Supp. 3d at 577 (quoting Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 16 (2d Cir. 2013) (emphasis in original)). Evert offers no facts to support her subjective belief that the statements were made out of discriminatory intent rather than anger at her actions surrounding the inmate incident.

Moreover, Evert admits that she was able to avoid the harassers entirely for two months while completing all of her duties in the ICU. "[I]n a gender-based hostile work environment case . . . the crucial question is not simply whether the remarks to which plaintiffs were subjected were of an explicitly sexual nature. It is rather whether the workplace atmosphere, considered as a whole, undermined plaintiffs' ability to perform their jobs, compromising their status as equals to men in the workplace." Dawson v. Cty. of Westchester, 373 F.3d 265, 274 (2d Cir. 2004). Thus, the alleged harassment by the corrections officers does not meet the standard of severe or pervasive harassment or abuse that interfered with Evert's ability to do her work. See Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014). Nor do her co-worker's teasing comments about receiving "love letters" and having a "boyfriend" rise to harassment. Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004) ("[W]e are mindful that Title VII does not establish a 'general civility code' for the American workplace . . . Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.").

As the Second Circuit has explained, "[e]veryone can be characterized by sex,

11

race, [or] ethnicity . . . and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." Alfano, 294 F.3d at 378. In this case, "there is overwhelming evidence that the hostility toward [Evert] was grounded in workplace dynamics unrelated to her sex . . . [C]rucially, this overwhelming evidence derives substantially from [Evert] herself, and her own view, clearly expressed, that the harassment was fundamentally the product of a workplace dispute . . . , and not from her being a woman." Brown, 257 F.3d at 256. Thus, plaintiff has not "carried her burden of showing—even for purposes of avoiding summary judgment—that the harassment she faced was rooted in her sex." Id. at 255 (finding the gender-based component of a hostile work environment claim unmet where the "bulk of the behavior [plaintiff cited], though often highly cruel and vulgar, related either to her union-related conflict . . . or to her purported affair with [a work colleague]"); see also Trinidad v. N.Y. City Dep't of Correction, 423 F. Supp. 2d 151, 167 (S.D.N.Y. 2006) (granting summary judgment in favor of defendants where plaintiff failed to show harassment was "related to her being a woman"). Accordingly, the gender discrimination claim must be dismissed.

**B.   Retaliation**

Evert also alleges that she faced retaliation for her complaints regarding the corrections officers. "To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a

causal connection between the protected activity and the adverse action.'" Kelly, 716 F.3d at 14 (quoting Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012)). "To prevail on a retaliation claim, 'the plaintiff need not prove that her underlying complaint of discrimination had merit,' but only that it was motivated by a 'good faith, reasonable belief that the underlying employment practice was unlawful.'" Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013) (quoting Lore, 670 F.3d at 157; and Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)). Specifically, a complainant "is 'required to have had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII.'" Kelly, 716 F.3d at 14 (quoting McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001)). "A plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form," even when the complaint cites reprehensible language or behavior. Kelly, 716 F.3d at 15 (citing Wimmer v. Suffolk Cnty. Police Dep't, 176 F.3d 125, 134-35 (2d Cir. 1999)).

For example, in Kelly, plaintiff was forced to quit after complaining that her employer showed unfair preference for his office paramour. 716 F.3d at 13. The Second Circuit held there was "no indication either that Kelly herself possessed a good-faith belief that she was complaining of conduct prohibited by Title VII or that her employers could have understood her complaints in this way." Id. at 16. They found that even a non-lawyer should have understood that her employer's pattern of unfairly rewarding his paramour did not violate Title VII because she did not allege "that she was being discriminated against on the basis of any trait, protected or otherwise." Id. at 17. It was objectively unreasonable to believe that such a complaint constituted

13

"protected activity" under Title VII. Evert's complaint suffers the same deficiency—it is objectively unreasonable to believe that complaining about poor treatment in the workplace that is unrelated to any trait, protected or otherwise, is a "protected activity" under Title VII.

But, even if it were, Evert has not alleged an adverse employment action for Title VII purposes. The transfer offered to Evert was a lateral move, with no change to pay or benefits. To be "materially adverse," the action must "result[ ] in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000) (internal citations omitted) (holding that a teacher's transfer from a special needs school to a regular school did not constitute an adverse employment action). "[S]ubjective dissatisfaction with assignments does not constitute adverse employment action." Brown v. Snow, No. 02 Civ. 7985(GEL), 2006 WL 623594, at *5 (S.D.N.Y. Mar. 13, 2006) (internal citation omitted). Because "an employee's preference for one assignment over another is not actionable under Title VII," id. at *5, Evert has failed to demonstrate that the proposed transfer constituted an adverse employment action. See also Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP, 915 F. Supp. 2d 498, 504 (S.D.N.Y. 2013).

Accordingly, Evert's retaliation claim must also be dimissed.

**C.   Constructive Discharge**

Constructive discharge of an employee will occur only "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily . . . Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the

employee's shoes would have felt compelled to resign." Chamblee v. Harris & Harris, Inc., 154 F. Supp. 2d 670, 675 (S.D.N.Y. 2001) (internal citations and quotations omitted). With respect to the claim here, "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." Pennsylvania State Police v. Suders, 542 U.S. 129, 149, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004). Evert's failure to establish the discriminatory element of her claims is therefore fatal to her constructive discharge claim. Thomas v. Bergdorf Goodman, Inc., No. 03 CIV. 3066 (SAS), 2004 WL 2979960, at *6 (S.D.N.Y. Dec. 22, 2004) ("[I]in order to state a *prima facie* case for constructive discharge, a plaintiff must establish that the constructive discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class.") (internal citations and quotations omitted).

Moreover, "[a]n employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge." Cooper v. Wyeth Ayerst Lederle, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000). Working with Prusak may have been subjectively unpleasant for the Evert, but it does not on this record rise to the level of objectively intolerable. Accordingly, the constructive discharge claim must also be dismissed. See Simmons-Grant, 915 F. Supp. 2d at 507 (finding plaintiff's "proffer . . . wholly inadequate to raise a fact issue" on constructive discharge claim where plaintiff relied on "evidence of a personality conflict between co-workers, focused on a disagreement about scheduling").

## V. CONCLUSION

Evert has failed to establish even a *prima facie* case that WCCH violated Title VII. Accordingly, WCCH motion for summary judgment is granted and the case is dismissed.

## VI. ORDERS

IT HEREBY IS ORDERED that Defendants Wyoming County Community Health System and Wyoming County Community Hospital's motion for summary judgment (Docket No. 15) is GRANTED;

FURTHER, that the Clerk of Court is directed to close this case.

SO ORDERED.

Dated: May 4, 2017
Buffalo, New York

                                           /s/William M. Skretny
                                           WILLIAM M. SKRETNY
                                           United States District Judge